IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | | |
|---|---|---|
| JOYLYNN HASKER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | |
| | ) | |
| BUSHNELL, INC. | ) | REQUEST FOR JURY TRIAL |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Joylynn Hasker ("Plaintiff") and for her Complaint for Damages against Defendant Bushnell, Inc., ("Defendant"), and alleges and states as follows:

### Parties and Jurisdiction

1. Plaintiff is a citizen of the United States, residing in Overland Park, Johnson County, Kansas, and at all times pertinent to this Complaint for Damages was an "employee" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e(f) et seq. ("Title VII").

2. Defendant is a Delaware corporation registered in the State of Delaware and employing at least 15 employees within the United States.

3. Defendant continuously operates offices located at 9200 Cody Street, Overland Park, Johnson County, Kansas 66214.

4. Defendant was at all times pertinent to this Complaint for Damages, an "employer" within the meaning of the Title VII, 42 U.S.C. § 2000e(b).

5. This Complaint is brought under Title VII, a federal statute.

6. Some, if not all, of the alleged unlawful employment practices took place in the State of Kansas, within the territory of the District of Kansas.

7. Jurisdiction and venue are proper in the District of Kansas pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §1391.

## Administrative Procedure and Procedural Posture

8. On or about September 26, 2019, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging Defendant discriminated against her on the basis of Plaintiff's sex and retaliated against her for making complaints of discrimination with Defendant Company.

9. On or about May 15, 2020, the EEOC issued to Plaintiff her Notice of Right to Sue (attached as Exhibit A and incorporated herein by reference).

10. Plaintiff's Complaint is filed within ninety (90) days of the issuance of the EEOC's Notice of Right to Sue.

11. The aforesaid Charge of Discrimination provided the EEOC sufficient opportunity to investigate the full scope of the controversy between the parties and, accordingly, the sweep of this judicial complaint may be and is as broad as the scope of an EEOC investigation, which could reasonably be expected to have grown out of the Charge of Discrimination.

12. Plaintiff has satisfied all private, administrative and judicial prerequisites to the institution of this action.

## General Allegations Common to All Counts

13. Plaintiff was an employee of Defendant from on or about May 11, 2015 until on or about April 3, 2019.

14. Plaintiff was employed by Defendant as a Quality Supervisor in Defendant's Quality & Compliance department.

15. Plaintiff is a woman.

16. Plaintiff is a member of the protected classes of sex.

17. Plaintiff was subjected to disparate treatment than male employees and stereotypical heterosexual female employees because of her sex and sexual orientation.

18. Plaintiff was subjected to constant derogatory remarks, personal attacks, and harassment by her male coworkers and managers because of her sex and because of her sexual orientation, which is lesbian, for the entire duration of her employment.

19. Plaintiff's employment was ultimately terminated by Defendant because of Plaintiff's sex and because of her sexual orientation, and in retaliation for making internal complaints of sex discrimination while employed by Defendant.

20. In or about November 2015, approximately six months after Plaintiff began working for Defendant, several male Product Managers, over whose work Plaintiff had oversight as Quality Supervisor, began making rude statements to Plaintiff and went out of their way to be disrespectful to Plaintiff.

21. Particularly Product Managers Bryan Parrish ("Parrish") and Clint Mermis ("Mermis") regularly criticized Plaintiff, made disparaging remarks toward Plaintiff, and verbally attacked Plaintiff with personal insults because of her sex and sexual orientation.

22. The aforementioned men were careful to avoid using specific defamatory terms referencing Plaintiff's sex and sexual orientation, however, the male Production Managers did not treat other men the same way, nor did they treat stereotypical, heterosexual women the same way they treated Plaintiff and other lesbian women.

23. The aforementioned male employees treated other male employees with appropriate respect and deference, but refused to treat lesbian employees, including Plaintiff, with respect and deference.

24. The aforementioned male employees treated stereotypical heterosexual female employees respectfully and professionally, but did not treat lesbian employees, including Plaintiff, the same way they treated stereotypical heterosexual women employees.

25. In addition to the discriminatory treatment from the male Production Managers, Vice President of Sales Johnnie Meese ("Meese") regularly targeted Plaintiff for profanity laced tirades because of Plaintiff's sex and sexual orientation.

26. Meese targeted Plaintiff for such tirades throughout Plaintiff's employment.

27. Meese did not target male employees or stereotypical heterosexual female employees for such profanity laced tirades.

28. Parrish, and Mermis, as well as other male Production Mangers, also treated three other lesbian employees similarly to Plaintiff by harshly and unnecessarily criticizing their work and attacking the women with personal insults.

29. The three other lesbian women were also fired in or about the same time frame Plaintiff was fired from her employment.

30. Plaintiff and the three other lesbian women were fired because of their sex and sexual orientation.

31. Plaintiff's job duties included suggesting and making system improvements to insure and improve the quality of the products Parrish, Mermis, and other Product Managers were developing or refining.

32. Parrish, Mermis, and possibly others, refused to work with Plaintiff because of her sex and sexual orientation.

33. In or about late 2015 Plaintiff began to notice Parrish, Mermis, and other male Production Managers would go around her to her male supervisor Brian Marquess ("Marquess") to discuss work projects rather than speak to Plaintiff.

34. Plaintiff complained to Marquess about the men's conduct.

35. Marquess told Plaintiff he saw the discriminatory treatment, but further told Plaintiff to "keep a low profile" because the company tended to support Production over Quality & Compliance.

36. Marquess did nothing to stop the discriminatory conduct directed at Plaintiff.

37. In or about late 2015 or early 2016 Plaintiff then complained to Darnetha Elmore ("Elmore") in Human Resources about the sex discrimination directed at her by Parrish, and Mermis, as well as other male Production Managers.

38. Plaintiff hoped Human Resources would at least direct her harassers to behave cordially toward her, but nothing was done to stop the men's behaviors.

39. In order to successfully complete her job, Plaintiff was required to run her ideas and issues through male team members, such as Marquess, among others, who would then pass on the information to the male Production Managers.

40. The male Production Managers received Plaintiff's suggestions, improvements, and information without issue or push back when received from male employees in Plaintiff's department.

41. The male Production Managers were not told the suggestions, improvements, and information came from Plaintiff.

42. Plaintiff continued to suffer discrimination and harassment because of her sex and sexual orientation into 2017.

43. In or about April 2017 Plaintiff sent a letter to Mark DeYoung ("DeYoung"), the CEO of Vista Outdoor, which is the division of Defendant company in which Plaintiff worked.

44. The men in production had been increasing their pushback and refused to provide Plaintiff with the product specification information necessary for Plaintiff to do her job.

45. DeYoung told Plaintiff he would address the issue and that he supported her position.

46. DeYoung communicated Plaintiff's complaints to Vice Presidents Gino Biondi ("Biondi"), Dave Allen ("Allen"), and Fred Lewis ("Lewis").

47. Biondi, Allen, and Lewis elected to support the men in production instead of appropriately addressing Plaintiff's complaints.

48. Biondi, Allen, and Lewis did nothing to address the ongoing discrimination directed towards Plaintiff and began to discriminate against Plaintiff themselves.

49. Biondi, Allen, and Lewis instructed Plaintiff to "stay in her lane," which Plaintiff later discovered was code used by the male employees in upper management for a woman whom they alleged was overstepping her bounds.

50. Biondi, Allen, and Lewis continued to restrict Plaintiff's ability to perform her job by ratifying the conduct of Parrish, Mermis, and other male Production Managers towards Plaintiff.

51. In or around May 2017 Bob Coughlin ("Coughlin") was hired to be the Director of the Quality & Compliance Department.

52. Upon information and belief, Biondi, Allen, and Lewis informed Coughlin of Plaintiff's complaint letter to DeYoung during Coughlin's job interview before Coughlin had formally been hired, and further informed Coughlin Plaintiff was "someone to be managed."

53. Plaintiff enjoyed a good working relationship with Coughlin despite the comments made to Coughlin by Biondi, Allen, and Lewis.

54. Plaintiff worked successfully under Coughlin until April of 2018 when Coughlin was transferred.

55. Coughlin recommended Plaintiff for a promotion just prior to his transfer.

56. Upon information and belief, Coughlin had been afraid to recommend Plaintiff for a promotion because he had been informed by Biondi that Biondi wanted to get rid of Plaintiff in retaliation for her complaint to DeYoung the previous year.

57. Biondi frequently referred to Plaintiff as "passionate," during this time frame, which Plaintiff later learned was another male upper management code word for "a woman in management that is allegedly acting out of her lane" and who does not automatically defer to the men in her department.

58. In or about April 2018 Mark Elliot ("Elliot") took over Quality & Compliance and became Plaintiff's direct supervisor.

59. Elliot discussed with Plaintiff the promotion for which Coughlin had recommended her and told her she would not be getting the promotion.

60. Elliot further told Plaintiff he considered her to be a "junior" manager.

61. Elliot treated Plaintiff has though she were ignorant, automatically discrediting Plaintiff's input because of her sex and sexual orientation.

7

62. Elliot refused to acknowledge Plaintiff's extensive experience and work history in quality control and dismissed Plaintiff's ideas and suggestions without considering the merits of Plaintiff's input.

63. Elliot changed Plaintiff's job duties, reducing her duties to projects involving inventory management and customer service despite Plaintiff's years of work in quality control systems and despite the fact these tasks were not part of her job in Quality & Compliance.

64. Upon information and belief, Elliot acted under Biondi's orders to reduce Plaintiff's job responsibilities in retaliation for her previous complaints of discrimination once Coughlin had been transferred and was no longer able to protect Plaintiff.

65. Elliot took the foregoing actions immediately following Coughlin's transfer in April 2018.

66. Beginning in April 2018, Elliot and Biondi began allowing male Product Managers and Engineers to begin behaving insolently toward Plaintiff once again.

67. Coughlin had put a stop to this behavior while he supervised Plaintiff.

68. In or about April or May 2018 Plaintiff complained again to Elmore in Human Resources about the renewed discrimination because of her sex and sexual orientation.

69. Human Resources did nothing to stop the renewed discrimination.

70. Plaintiff also contacted Melanie McIntyre in General Counsel's office several times to complain, only to be referred back to Biondi and Elliot.

71. In or about the latter part of 2018, Plaintiff contacted Corporate Ethics Department Manager Bob Shuettler ("Shuettler") to make complaint.

72. Shuettler took Plaintiff's complaint and agreed it was a problem that needed to be resolved.

73. Shuettler further told Plaintiff he knew she should not be reporting to Biondi and Elliot, who were ratifying and participating in the discrimination and retaliation, but he was afraid to say anything to the President of Bushnell because it would draw attention to the situation and would be very uncomfortable.

74. Shuettler feared how Biondi and Elliot would react and allowed the continuing mistreatment to go unaddressed.

75. In or about December 2018, Shuettler hired a new person, Hannah Perkins ("Perkins") to assist him with investigation of open complaints.

76. Shuettler informed Plaintiff Perkins would be taking over investigation of her complaint.

77. Plaintiff met with Perkins in or about December 2018.

78. Perkins told Plaintiff the way she was being discriminated against because of her sex was not right, and she promised to investigate and get back to Plaintiff.

79. Perkins failed to appropriately address the discrimination perpetrated against Plaintiff and ultimately closed the investigation in or about January 2019, choosing to defend the discriminators.

80. On or about December 5, 2018 Elliot began having one to one meetings with Plaintiff to discuss items he considered to be performance issues.

81. The meetings progressed with increased aggression from Elliot towards Plaintiff, who began to insult Plaintiff with great frequency, falsely alleging she lacked the necessary experience to be in Quality & Compliance, despite the fact Plaintiff had been in her position since May 2015, had successful performance reviews, and had successfully

9

performed her job over the three previous years so long as her male discriminators did not know she was behind the work performed.

82. In or about December 2018 Elliot began sending Plaintiff "notes" or alleged summaries of his meetings with Plaintiff, which were false.

83. Plaintiff recognized Elliot was manufacturing a pretextual case to fire Plaintiff through creation of false documentation.

84. Plaintiff also recognized the formatting Elmore had told her to use for performance improvement plans with her own subordinates within Elliot's communications with Plaintiff.

85. Plaintiff further witnessed Elmore speaking with Elliot in Elliot's office immediately following Elliot's meetings with Plaintiff.

86. In or about late December 2018, Elliot scheduled a one to one meeting with Plaintiff.

87. When Plaintiff arrived for the meeting, Elmore was present as well.

88. During this meeting, Elliot told Plaintiff she should get some coaching from Elmore on interpersonal communication skills.

89. Elliot told Plaintiff the foregoing despite the fact Plaintiff had historically received high ratings for interpersonal skills in performance reviews.

90. Elmore said nothing about Plaintiff's prior complaints of discrimination during this meeting and entirely supported Elliot.

91. In or about February 2019 Biondi called Plaintiff to his office, where he and Elliot dressed her down for allegedly not involving herself in product validation processes during development.

92. Plaintiff pointed out that Elliot had changed her duties and instructed Plaintiff to "stay in her lane" on multiple occasions since Elliot had taken over Quality & Compliance in April 2018.

93. Plaintiff further pointed out Elliot had told Plaintiff that design was for product engineers and not for Quality Control to butt into, and further directed her not to involve herself in the product validation process during development.

94. When Plaintiff informed Biondi and Elliot of Elliot's instructions to her both men became angrier with Plaintiff and openly expressed outrage and hostility toward her.

95. Biondi and Elliot discriminated and retaliated against Plaintiff on this occasion by blaming her for alleged production problems they had created by discriminating against Plaintiff because of her sex and sexual orientation, and in retaliation for Plaintiff's making complaints of unlawful discrimination.

96. Biondi and Elliot ordered Plaintiff not to participate in product validation, then blamed her for failing to do the very thing they ordered her not to do.

97. Throughout Plaintiff's employment with Defendant, Plaintiff's coworkers were openly permitted to make derogatory remarks about Plaintiff's sex and sexual orientation without punishment or correction.

98. Throughout Plaintiff's employment with Defendant, Plaintiff was denied information concerning product specifications, which made it impossible for her to test products appropriately and to perform her job.

99. Plaintiff was then blamed by Defendant for failing to appropriately test products.

100. Plaintiff was additionally directed not to test products by Biondi and Elliot, but subsequently held responsible for failing to do so.

101. Plaintiff was discriminated against because of her sex and sexual orientation in that she was purposefully denied necessary information to appropriately perform her job, which male employees and stereotypical heterosexual women were not denied.

102. Plaintiff was further discriminated against because of her sex and sexual orientation in that her job duties were changed, and she was directed not to perform testing, but later blamed for not testing product.

103. Male employees and stereotypical heterosexual female employees were not set up for failure the way Plaintiff was set up.

104. On or about March 14, 2019 Elmore contacted Plaintiff via telephone and informed Plaintiff she was suspended from work pending investigation into an ethics complaint made about Plaintiff.

105. Elmore further instructed Plaintiff not to speak to anyone at the Defendant company other than Elmore.

106. Elmore asserted she was not at liberty to provide any details related to the alleged ethics complaint.

107. On or about March 29, 2019 Elmore contacted Plaintiff for a meeting with Elmore and Perkins, who was investigating the alleged ethics complaint against Plaintiff.

108. Plaintiff had been accused of bypassing procedures and causing defective product to be passed as sellable.

109. The foregoing allegation was false and was used as a pretext to set up the firing of Plaintiff, who was actually fired because of her sex and her sexual orientation and in retaliation for making complaints of illegal discrimination.

110. On or about April 3, 2019 Elmore contacted Plaintiff via telephone and informed her Plaintiff's employment was terminated effective immediately.

111. Following termination of her employment, several Engineers at Defendant company contacted Plaintiff and confirmed she was fired because she is a woman and because she is a lesbian.

112. One of the Engineers who contacted Plaintiff was Nick Wolfe ("Wolfe").

113. Wolfe told Plaintiff he knew Plaintiff had been fired because of her sex and sexual orientation because Biondi and Elliot had both told him Plaintiff was fired because she is a lesbian.

114. Additionally, Plaintiff learned from Senior Engineer Derrick Horsch ("Horsch") that he had been contacted by Defendant when Plaintiff had been suspended.

115. Defendant, through its employees Elmore, Biondi, and Elliot, tried to convince Horsch to condemn Plaintiff and throw her under the bus.

116. Horsch refused and resigned his position with Defendant because of their treatment of Plaintiff.

117. Horsch subsequently informed Plaintiff of Defendant's actions and his own resignation.

118. Plaintiff has been discriminated against in her employment by Defendant because of her sex and sexual orientation and has been retaliated against by Defendant for making complaints of illegal discrimination.

119. Defendant's reasons for firing Plaintiff were pretext for Defendant's discrimination against Plaintiff because of her sex and sexual orientation.

**COUNT I – VIOLATION OF TITLE VII - SEX DISCRIMINATION**

120. Plaintiff hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 120 above.

121. Plaintiff is a woman, and therefore a member of the protected class of "sex."

122. Plaintiff was subjected to sex discrimination at the hands of Defendant and/or Defendant's agents and subordinates, in that Defendant permitted Plaintiff's coworkers and supervisors to treat Plaintiff differently than they treated male employees and stereotypical heterosexual female employees.

123. Plaintiff reported the discriminatory practices to Defendant, and Defendant (through its agents, other employees, managers, and supervisors) made no attempt to remedy the situation, but rather ignored Plaintiff's complaints and eventually took disciplinary action against Plaintiff for making complaints.

124. Plaintiff's sex and sexual orientation was the reason she was treated differently than her male and stereotypical heterosexual female coworkers.

125. Defendant's discrimination against Plaintiff directly and materially affected a term, condition, or privilege of Plaintiff's employment in that she was prohibited from performing the functions of her job, sabotaged in the performance of her job, and was subjected to harassment and beratement at the hands of her coworkers because of her sex and sexual orientation.

126. By not taking action to stop or rectify the disparate treatment, harassment, sabotage, and undue restrictions in performing her job, Defendant ratified, authorized and/or condoned the conduct of its agents and employees.

127. Defendant knew of the discrimination and failed to take appropriate action, or any remedial action whatsoever.

128. Plaintiff was ultimately discharged from her job because of her sex and sexual orientation.

129. As a direct and proximate result of Defendant's actions and/or omissions, Plaintiff has been deprived of income, as well as other monetary and non-monetary benefits.

130. As a further direct and proximate result of Defendant's actions and/or omissions, Plaintiff has suffered a loss of self-esteem, humiliation, emotional distress, mental anguish, pain and suffering, and related compensatory damages.

131. By failing to take prompt and effective remedial action, Defendant in effect condoned, ratified, and/or authorized the discrimination against Plaintiff.

132. As shown by the foregoing, Defendant's conduct was willful, wanton, and malicious, and showed complete indifference to or conscious disregard for the rights of others, including the rights of Plaintiff, thus, justifying an award of punitive damages in an amount sufficient to punish Defendant or to deter them and other companies from the conduct in the future.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against the Defendant for economic damages, including, but not limited to: back pay, lost benefits and front pay, injunctive relief, compensatory damages, punitive damages, for reasonable attorney fees and costs incurred herein, for pre- and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as this Court deems just and proper.

### COUNT II – VIOLATION OF TITLE VII - SEX DISCRIMINATION – HOSTILE WORK ENVIRONMENT

133.	Plaintiff hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 132 above.

134.	Plaintiff is a woman, and therefore a member of the protected class of "sex."

135.	Plaintiff was subjected to sex discrimination and/or subjected to a hostile work environment at the hands of Defendant and/or Defendant's agents and subordinates, in that Defendant permitted Plaintiff's coworkers to discriminate against her and harass her on a nearly daily basis over the course of three years and eleven months because of her sex (female) and her sexual orientation, and either refused or failed to stop the discriminating and harassing behaviors despite notice of the ongoing discrimination.

136.	Plaintiff reported her coworker's discriminatory conduct to Defendant multiple times, and Defendant (through its agents, other employees, managers, and supervisors) made no attempt to remedy the situation, but rather ignored Plaintiff's complaints and eventually took disciplinary action against Plaintiff for making complaints.

137.	The discrimination Plaintiff suffered at the hands of Defendant through Defendant's agents and subordinates was so severe and pervasive that it directly affected the terms and conditions of Plaintiff's employment with Defendant by denying her the benefit of a safe and discrimination free work environment.

138.	Plaintiff's sex and sexual orientation was the reason the severe and pervasive discrimination, harassment, and retaliation occurred.

139.	Defendant's discrimination against Plaintiff directly and materially affected a term, condition, or privilege of Plaintiff's employment because the conditions were

continuous, outrageous, humiliating, and unreasonably interfered with Plaintiff's ability to perform the functions of her employment.

140. By not taking action to stop Plaintiff's coworkers from discriminating against and harassing Plaintiff, Defendant ratified, authorized and/or condoned the conduct of its agents and employees.

141. Defendant knew of the discrimination and failed to take appropriate action, or any remedial action whatsoever.

142. Plaintiff was ultimately discharged from her job because of her sex and sexual orientation.

143. As a direct and proximate result of Defendant's actions and/or omissions, Plaintiff has been deprived of income, as well as other monetary and non-monetary benefits.

144. As a further direct and proximate result of Defendant's actions and/or omissions, Plaintiff has suffered a loss of self-esteem, humiliation, emotional distress, mental anguish, pain and suffering, and related compensatory damages.

145. By failing to take prompt and effective remedial action, Defendant in effect condoned, ratified, and/or authorized the discrimination against Plaintiff.

146. As shown by the foregoing, Defendant's conduct was willful, wanton, and malicious, and showed complete indifference to or conscious disregard for the rights of others, including the rights of Plaintiff, thus, justifying an award of punitive damages in an amount sufficient to punish Defendant or to deter them and other companies from the conduct in the future.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against the Defendant for economic damages, including, but not limited to: back pay, lost benefits and

front pay, injunctive relief, compensatory damages, punitive damages, for reasonable attorney fees and costs incurred herein, for pre- and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as this Court deems just and proper.

### COUNT III – VIOLATION OF TITLE VII - RETALIATION

147. Plaintiff hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 146 above.

148. Plaintiff engaged in protected activity by making multiple complaints of sex discrimination within the workplace to employer.

149. Plaintiff was subjected to retaliation and/or subjected to a hostile work environment at the hands of Defendant and/or Defendant's agents and subordinates, in that Defendant retaliated against Plaintiff and further permitted Plaintiff's coworkers to retaliate against her and harass her because she complained of their discrimination against her, and either refused or failed to stop the retaliation and harassment.

150. Plaintiff complained of the retaliatory conduct to Defendant multiple times, and Defendant (through its agents, other employees, managers, and supervisors) made no attempt to remedy the situation, but rather ignored Plaintiff's complaints and eventually took disciplinary action against Plaintiff for making complaints.

151. Plaintiff's complaints and protected activities were the reason the severe and pervasive harassment, and retaliation occurred.

152. Defendant's retaliation against Plaintiff directly and materially affected a term, condition, or privilege of Plaintiff's employment because the conditions were

continuous, outrageous, humiliating, and unreasonably interfered with Plaintiff's ability to perform the functions of her employment.

153. By taking actions against Plaintiff in retaliation for her complaints and protected activity, and by not taking action to stop Plaintiff's coworkers and supervisors from retaliating against and harassing Plaintiff, Defendant ratified, authorized and/or condoned the conduct of its agents and employees.

154. Defendant knew of the retaliation and failed to take appropriate action, or any remedial action whatsoever.

155. Plaintiff was ultimately discharged from her job in retaliation for making complaints of illegal discrimination.

156. As a direct and proximate result of Defendant's actions and/or omissions, Plaintiff has been deprived of income, as well as other monetary and non-monetary benefits.

157. As a further direct and proximate result of Defendant's actions and/or omissions, Plaintiff has suffered a loss of self-esteem, humiliation, emotional distress, mental anguish, pain and suffering, and related compensatory damages.

158. By failing to take prompt and effective remedial action, Defendant in effect condoned, ratified, and/or authorized the retaliation against Plaintiff.

159. As shown by the foregoing, Defendant's conduct was willful, wanton, and malicious, and showed complete indifference to or conscious disregard for the rights of others, including the rights of Plaintiff, thus, justifying an award of punitive damages in an amount sufficient to punish Defendant or to deter them and other companies from the conduct in the future.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against the Defendant for economic damages, including, but not limited to: back pay, lost benefits and front pay, injunctive relief, compensatory damages, punitive damages, for reasonable attorney fees and costs incurred herein, for pre- and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as this Court deems just and proper.

**Demand for Jury Trial and Designation of Place of Trial**

Plaintiff requests a trial by jury, in Kansas City, Kansas, on all counts and allegations of wrongful conduct alleged in this Complaint.

Respectfully Submitted,

LAW OFFICE OF MADELINE JOHNSON

/s/ *Madeline Johnson*
Mary Madeline Johnson, D. Kan. # 77985
220 Main Street, Suite 201
Platte City, Missouri 64079
Telephone: (816) 607-1836
Facsimile: (816) 817-5507
Email: mmjohnsonlaw@gmail.com

ATTORNEY FOR PLAINTIFF